UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JUDY JOHNSON,

                                        Plaintiff,

                                                                **OPINION AND ORDER**
                 - against -

                                                                No. 12-CV-3301 (CS)
YWCA RESIDENCE, LLC, and LORI STANLICK,
Individually and in Her Official Capacity,

                                        Defendants.
------------------------------------------------------------------------x

Appearances:
Judy Johnson
Raleigh, North Carolina
*Plaintiff Pro Se*

Siobhan A. Healy
Babchik & Young, LLP
White Plains, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is the Motion for Summary Judgment of Defendants YWCA Residence,

LLC ("YWCA")[1] and Lori Stanlick.  (Doc. 25.)  For the reasons set forth below, Defendants'

Motion is GRANTED.

## I.  BACKGROUND

        The following facts are drawn from the parties' Local Rule 56.1 Statements, affidavits,

and exhibits, and are undisputed except where noted.  "It is well established that the submissions

of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments

---

[1] Defendant YWCA Residence, LLC was mistakenly identified as "YWCA Residence of White Plains, LLC" in
Plaintiff's original complaint.

that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*) (internal quotation marks and emphasis omitted).

## A. Facts

From 2005 to 2011, Plaintiff Judy Johnson lived at the YWCA Residence in White Plains, New York, (Ds' 56.1 ¶¶ 2, 6, 22),[2] which provides housing and other support services for low-income women, (*id.* ¶¶ 2, 5).  Under the terms of Plaintiff's lease agreement,[3] the monthly rent was due on the first of each month, and Plaintiff could be found in default if payment was not received by the fifth of the month.  (*Id.* ¶¶ 6-7.)  Due to various financial difficulties, however, Plaintiff frequently had difficulty paying the entire month's rent up front.  (*Id.* ¶¶ 8a-8kk.)  Accordingly, Plaintiff and the YWCA would periodically enter into deferred payment agreements.  (*Id.*)  The YWCA often allowed Plaintiff to pay her rent in bi-monthly installments to accommodate the schedules on which she received her paycheck and social security income. (*See, e.g.*, *id.* ¶¶ 8p, 8w, 8y.)  A full recitation of Plaintiff's arrears history is not necessary; it suffices to note that despite the flexibility that the YWCA afforded her, Plaintiff was delinquent on her various payment obligations and agreements many times over the years.  (*See generally id.* ¶¶ 8a-8kk.)

Residents of the YWCA live in two adjacent buildings:  Acheson Wallace Hall ("AWH") and the Kennedy Duncan Residence ("KDR").  (*Id.* ¶ 3.)  In 2008, the YWCA finalized plans for significant renovations to both residential buildings.  (*Id.* ¶ 13.)  Defendants assert that the

---

[2] "Ds' 56.1" refers to [Defendants'] Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.  (Doc. 28.)

[3] Although Plaintiff periodically entered into one-year leases with the YWCA, many of the years in which she resided there appear not to have been governed by any written lease. (*See generally* Ds' 56.1 ¶ 6; Affirmation [of Siobhan Healy] in Support of Defendants' Motion for Summary Judgment ("Healy Aff."), (Doc. 26), Exs. D, E, F; [Plaintiff's] Rule 56.1 Statement of Facts ("P's 56.1"), (Doc. 38), 4 (referring to month-to-month tenancy); Plaintiff's Memorandum in Opposition to Defendants' Memorandum of Law and Defendants' Motion for Summary Judgment ("P's Opp."), (Doc. 37), 24 (referring to gaps between leases).)  In any event, the existence or absence of a controlling lease does not affect my ruling on the instant Motion.

renovations did not begin until 2009, (*id.* ¶¶ 13-14), but Plaintiff claims that significant

construction was done to the roof of the AWH building for several months in 2008,[4] (P's Opp. 9-

10).  Because Plaintiff lived on the top floor of AWH, the roof construction was particularly

disruptive to her.  (*Id.* at 10.)  Plaintiff states that she was exposed to "extremely loud noises

(drilling), nauseating noxious fumes, black tar, and mold, asbestos, and lead," and alleges that

temperatures often exceeded 90 degrees when the ventilation system was shut off.  (*Id.*)  At that

time, Plaintiff was working at night and needed to sleep during the day, which was difficult

because of the construction.  (*Id.*)  Additionally, Plaintiff claims that she was required to keep

her windows open to allow the construction crews to run power lines to the outlets in her

apartment (despite other tenants being told to keep their windows closed to avoid the fumes, (*id.*;

Brown Letter ¶ 1; Smith Letter ¶ 1)),[5] and that she was forbidden from using her kitchen.  (P's

Opp. 10.)  Plaintiff alleges that she "reach[ed] out to county, state and local officials," but that

her "complaints fell on deaf ears."  (*Id.*)  Plaintiff alleges that she thereafter filed a complaint

with the United States Department of Housing and Urban Development ("HUD"), (*id.*), but as

discussed below, the record shows that Plaintiff's HUD complaint was not filed until 2010.

In February 2009, the YWCA notified tenants of its plan to conduct renovations to the

two residential buildings one at a time.  (Ds' 56.1 ¶ 16; Healy Aff. Ex. N (memorandum to

residents dated Feb. 16, 2009).)  AWH would be renovated first, and all residents of that building

would be relocated either into KDR or into other housing in the community for the duration of

the construction.  (Ds' 56.1 ¶ 15.)  Once the work was completed, all residents of KDR would

---

[4] This dispute of fact is not material to the allegations in the Complaint.  Even accepting as true Plaintiff's factual contention that extremely disruptive work was done on the roof in 2008, Defendants are still entitled to judgment as a matter of law on Plaintiff's retaliation claim as described below.

[5] "Brown Letter" refers to the notarized letter of Mary Brown dated March 1, 2014.  (P's Opp. 21.)  "Smith Letter" refers to the notarized letter of Nancy Smith dated March 5, 2014.  (*Id.* at 22.)  These documents are not sworn but I will nevertheless consider them.

then be swapped back into AWH to allow for KDR to be renovated.  Plaintiff's request to transfer to KDR was approved in April 2009, and Plaintiff relocated into that building shortly thereafter.  (*Id.* ¶ 19; Stanlick Aff. ¶ 16; Healy Aff. Ex. O.)  During this time, Plaintiff's rent arrears were growing; by mid-2009 she owed almost four months' rent, and the YWCA initiated an eviction proceeding against her in state court.  (*See* Ds' 56.1 ¶¶ 8q-8u and exhibits cited therein.)  That proceeding was ultimately voluntarily terminated by the YWCA in August 2009 when Plaintiff paid the full amount owed.  (*Id.* ¶ 8u.)  Weeks later, however, Plaintiff fell back into arrears, and the YWCA again agreed to deferred payment plans over the next several months.  (*Id.* ¶¶ 8v-8aa.)

On February 9, 2010, Plaintiff signed a formal complaint for submission to HUD.  (Healy Aff. Ex. S, at 3-5.)  The complaint alleged that before and up to February 2009, the YWCA had discriminated against Plaintiff on the basis of her gender and low-income status by, among other things, failing to maintain proper living conditions in the YWCA.[6]  (*Id.*)  While Plaintiff's signature on the complaint is dated February 9, 2010, the "Filing Date" – which appears to have been entered on the form by HUD – is listed as July 12, 2010.  (*Id.* at 3.)  The record contains no explanation for this delay.  The YWCA received notice of the complaint no earlier than July 15, 2010.  (*See id.* at 1 (transmittal letter to YWCA date-stamped July 15, 2010); Stanlick Aff. ¶¶ 30-31.)

Meanwhile, renovations to AWH were nearing completion, and the YWCA projected that it would begin swapping residents back out of KDR into AWH in September 2010.  (Stanlick Aff. ¶ 21; Ds' 56.1 ¶ 20.)  Defendant Lori Stanlick, the YWCA official who was responsible for overseeing the residential program, asserts:

---

[6] Notably, the YWCA is a facility that serves only women, many (if not most) of whom share Plaintiff's categorization as "low-income."  (*See* Stanlick Aff. ¶ 2 (referring to "YWCA Residence for Women"); *id.* ¶ 3 ("The YWCA Residence . . . provides safe, affordable, comfortable housing for low-income women . . . .").)

> Since AWH was renovated using funds received from the Tax Credit Assistance Program under the American Recovery and Reinvestment Act of 2009, it was necessary for applicants to be in good-standing with their rent payments and in compliance with program requirements (such as, for example, income level requirements) in order to be eligible for housing in the newly renovated AWH building. . . . To give KDR tenants time to cure their arrears and become eligible to move to AWH, in early 2010, YWCA Residence stopped making payment arrangements, and instead began requiring tenants to pay their full rent amounts on a monthly basis. . . . YWCA Residence still permitted tenants to pay rent on a bi-weekly basis, but required the tenants to be up-to-date on their rent payments by the end of the month. Tenants were not permitted to carry over arrears from one month to the next.

(Stanlick Aff. ¶¶ 20-22.) On April 13, 2010, Plaintiff was notified that the YWCA was no longer approving any deferred payment plans. (Ds' 56.1 ¶¶ 11-12; Healy Aff. Ex. H (memorandum to Plaintiff dated Apr. 13, 2010).) Stanlick states that this was an across-the-board policy change that affected all residents, not just Plaintiff, (Stanlick Aff. ¶¶ 18-22, 26), and contemporary emails between Stanlick and other YWCA staff members corroborate this account, (Healy Aff. Ex. I ("Notices for late payments need to be given uniformly. . . . We are not establishing payment arrangements at this time.")).[7]

In May and June 2010, Plaintiff continued to fall behind on rent payments, and on July 7, 2010, the YWCA sent Plaintiff a "three day notice" advising her that if her arrears were not cured immediately, an eviction proceeding would be initiated against her. (Stanlick Aff. ¶¶ 23-24, 27; Healy Aff. Ex. G.) On July 14, 2010, Plaintiff and another resident (who was in a similar situation) submitted cashier's checks in attempts to make partial rent payments. (Ds' 56.1 ¶ 8ee). On July 15, YWCA's counsel commenced an eviction proceeding in state court against Plaintiff.

---

[7] I make no determination as to whether the American Recovery and Reinvestment Act of 2009 in fact imposes any such requirements; it suffices for purposes of the instant Motion that Defendants changed their policy regarding deferred payment plans on the basis of perceived legal requirements and applied that change to all residents equally. In other words, whether or not the change in policy was required by law, there is no dispute that (for whatever reason), Defendants stopped making payment arrangements at least by April 2010, and before Plaintiff's protected activity, as documented by an April 13, 2010 memo, (Healy Aff. Ex. H), and June 29, 2010 email, (id. Ex. I).

(*See* Healy Aff. Ex. L.)  That same day, the YWCA received notice of Plaintiff's HUD

complaint, which had been "filed" three days earlier as discussed above.  (*See* Stanlick Aff.

¶¶ 30-31; Healy Aff. Ex. S at 1 (copy of HUD complaint date-stamped July 15, 2010).)[8]  The

next day, on July 16, Plaintiff was one of four residents who were served with legal process in

connection with eviction proceedings.  (Ds' 56.1 ¶ 8gg.)  Ms. Stanlick states that Plaintiff was

the only one of these four women who had filed a complaint with HUD.  (Stanlick Aff. ¶ 32.)

On July 19, YWCA's counsel advised the YWCA to return any partial payments offered by the

residents against whom eviction proceedings had been commenced, (*id.* ¶ 33; *see* Healy Aff. Ex.

J (correspondence from counsel)), and Plaintiff's cashier's check was returned to her later that

day, (*see* Healy Aff. Ex. K).  Plaintiff ultimately paid the entire balance she owed at a court

appearance on July 29, 2010.  (Ds' 56.1 ¶ 8hh.)

Thereafter, Plaintiff "generally remained current on her rent" with some minor

exceptions.  (Stanlick Aff. ¶ 35.)  In October 2010, when the YWCA began moving residents

back from KDR to AWH, Plaintiff applied to move into AWH and requested permission to room

with several other women; those requests were approved by Stanlick.  (Ds' 56.1 ¶¶ 20-21;

Stanlick Aff. ¶ 37.)  Plaintiff resided in AWH until late June 2011, when she voluntarily moved

out of the YWCA.  (Ds' 56.1 ¶ 22.)

### B. Procedural Posture

On October 28, 2010, Plaintiff filed a complaint with the Westchester County Human

Rights Commission ("WCHRC"), alleging, among other things, that Defendants retaliated

against her for filing her HUD complaint.  (*See* Healy Aff. Ex. T.)  After conducting an initial

---

[8] Stanlick in her affidavit seems to assume that the July 15, 2010 date stamp on the letter transmitting Plaintiff's HUD complaint was placed there by the YWCA. (*See* Stanlick Aff. ¶ 30; Healy Aff. Ex. S, at 1.) It appears possible to the Court that the date was placed there by HUD, and that Defendants would have received it thereafter. But I will assume for purposes of the instant Motion that Defendants received the complaint on July 15, 2010.

investigation, WCHRC on May 23, 2011 issued a Determination and Order finding probable

cause to support Plaintiff's allegations.  (Complaint ("Compl."), (Doc. 2), exhibit starting at page

5.)  In lieu of having the matter heard before an Administrative Law Judge, Plaintiff elected to

file a separate civil action, and WCHRC subsequently issued an administrative dismissal.  (Healy

Aff. Ex. U.)

Plaintiff filed the instant lawsuit on April 25, 2012, proceeding *pro se* and *in forma*

*pauperis*.  (*See* Compl.)  The Complaint alleges that Defendants initiated the July 2010 eviction

proceedings against Plaintiff in retaliation for her filing the HUD complaint, in violation of

Section 818 of the Fair Housing Act ("FHA"), codified at 42 U.S.C. § 3617, and corresponding

sections of the Westchester County Fair Housing Law.  (Compl. at 2-3.)  Defendants answered

the Complaint, and after completing discovery, Defendants filed the instant Motion for Summary

Judgment.  (Doc. 25.)

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

## III.  DISCUSSION

In support of their motion for summary judgment, Defendants argue (among other things) that Plaintiff has failed to establish a *prima facie* case of retaliation under the FHA, and that in any event Defendants' actions were taken for legitimate, non-retaliatory reasons that Plaintiff has failed to prove are merely pretext.  (Ds' Mem. 7-10, 13-15.)[9]  In opposition, Plaintiff does not directly address Defendants' arguments but asserts that summary judgment is foreclosed by several disputes of material fact.  (*See, e.g.*, P's 56.1 at 2-4; P's Opp. 2-4.)  Even under the liberal standard governing submissions by *pro se* parties, *see Triestman*, 470 F.3d at 474, I conclude – for essentially the reasons stated in Defendants' papers – that Plaintiff has failed to establish a genuine dispute of material fact as to whether the YWCA's actions were retaliatory.[10]

The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, prohibits discrimination in the sale or rental of residential housing on the basis of race, gender or disability, among other things.  *See id.* § 3604.  Under the FHA, it is also unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the FHA.  *Id.* § 3617.  To prevail on her claim for retaliation under Section 3617, Plaintiff must prove:  "(1) that [she] engaged in protected activity by opposing conduct prohibited under the FHA; (2) that [D]efendants were aware of that activity; (3) that [D]efendants subsequently took adverse action against [her]; and (4) that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse action."  *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432

---

[9] "Ds' Mem." refers to Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  (Doc. 30.)

[10] In light of this ruling, I need not address Defendants' separate argument that Plaintiff has not suffered any harm as a result of Defendants' conduct.  (*See* Ds' Mem. 11-12.)

(S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d Cir. 2007) (summary order). "Protected activity under the FHA refers to action taken to protest or oppose statutorily prohibited discrimination." *Stable v. Kelly Towers Assocs.*, No. 05-CV-3132, 2007 WL 80866, at *2 (S.D.N.Y. Jan. 10, 2007) (internal quotation marks omitted); *see* 24 C.F.R. § 100.400(c)(5) (HUD regulation interpreting Section 3617 as prohibiting "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.").

Retaliation claims under the FHA are subject to the *McDonnell Douglas* burden-shifting framework. *See RECAP, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002), *superseded by statute on other grounds as stated in McCulloch v. Town of Milan*, No. 12-4574-CV, 2014 WL 1189868, at *1 (2d Cir. Mar. 25, 2014) (summary order); *accord Mazzocchi v. Windsor Owners Corp.*, No. 11-CV-7913, 2013 WL 5295089, at *12 (S.D.N.Y. Sept. 17, 2013); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, "[a] plaintiff must establish a prima facie case; the [defendant] must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (internal quotation marks omitted).

In this case, Plaintiff has failed to establish a *prima facie* case of retaliation. There is no evidence in the record demonstrating that retaliatory motive played any part in Defendants' actions in changing their policy regarding deferred payment arrangements or in initiating the eviction proceedings. Plaintiff was treated in exactly the same manner as were the other residents who owed past rent, none of whom engaged in any protected activity. (*See, e.g.*,

Stanlick Aff. ¶ 32.)  Plaintiff was one of four women served with eviction petitions on July 16,

2010, (Ds' 56.1 ¶ 8gg), and Plaintiff was one of two women who tried to cure their arrears with

partial payments that were rejected, (Stanlick Aff. ¶ 33; *see* Healy Aff. Ex. G).  Plaintiff does not

address these facts in her papers, nor does she offer any evidence to create a genuine dispute as

to these facts.

Additionally, Plaintiff cannot rely on the inference of retaliatory intent that can often be

drawn when the protected activity is followed closely in time by the adverse action.  *See RECAP*,

294 F.3d at 54.  The record does not suggest that Defendants were aware of Plaintiff's HUD

complaint when they took the actions of which Plaintiff complains.  The eviction proceeding that

Plaintiff alleges was retaliatory was the result of a process that began before Defendants received

notice of Plaintiff's HUD complaint.  Although Plaintiff's signature on the HUD complaint is

dated February 9, 2010, there is no evidence in the record that Defendants had notice of the

complaint prior to July 15, 2010, when they received a copy of the complaint from HUD.  (*See*

Stanlick Aff. ¶¶ 30-31; Healy Aff. Ex. S, at 1.)  The eviction petition is dated July 15, 2010,

(Healy Aff. Ex. L), the same day that Defendants received notice of Plaintiff's HUD complaint –

which, standing alone, might theoretically allow for an inference of retaliatory intent.

But as Defendants point out, the "three day notice" pursuant to which that petition was

filed was given to Plaintiff on July 7, 2010 – more than a week *before* her HUD complaint came

to Defendants' attention.  Additionally, given the preparatory work involved in drafting a legal

petition, the necessity of filing that petition with the court, and the delay that must accompany

receiving a document (the HUD complaint) in the mail before it is brought to the attention of the

appropriate officials, any rational finder of fact would conclude, on the basis of this record, that

the decision to file the eviction petition was made before Defendants received notice of

Plaintiff's HUD complaint. Accordingly, in the absence of any evidence that Plaintiff was

treated differently from other residents who did not file complaints, and given the timing of

events just discussed, no rational finder of fact would conclude that Defendants were aware of

the protected activity at the time they filed the eviction petition, or that there was any causal

relationship between the two.[11]

In any event, even if I found that Plaintiff had satisfied her initial burden of production

and had established a *prima facie* case of retaliation, Defendants would still be entitled to

summary judgment, because Plaintiff has offered no evidence tending to show that Defendants'

asserted legitimate, non-retaliatory reasons for their actions were merely pretext. Defendants

have explained that the renovation of the AWH building was funded in part using money from a

federal program, and that applicants for residence in the newly renovated building were required

under that federal program to be up-to-date on rent payments. (Stanlick Aff. ¶¶ 20-22.)

---

[11] The adverse action alleged in the Complaint is the initiation of the July 2010 eviction proceedings. (Compl. at 3.) On her WCHRC complaint attached to the Complaint, Plaintiff also alleges that Defendants refused to extend her a payment schedule in retaliation for her HUD complaint. (*Id.* at 9.) Even if the adverse action is regarded as Defendants' unwillingness to entertain deferred payment plans as they had in the past, it is undisputed that that policy change was instituted and implemented before Defendants knew of Plaintiff's protected activity. She thus cannot establish the knowledge and causal connection elements of her *prima facie* case.

At her deposition, when confronted with the fact that the eviction was in the works before Defendants got her HUD complaint, Plaintiff suggested that the eviction was in retaliation for a 2008 complaint to the Mayor of White Plains or an unidentified HUD complaint some time in 2009. (*See* Healy Aff. Ex. C, at 69-72.) A Plaintiff may not, in opposing a motion for summary judgment, rely on theories not set forth in the Complaint. *See, e.g.*, *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6-7 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered . . . .") (internal citations omitted). Even if I considered those theories, however, they would fail. There is no evidence that these complaints were complaints of discrimination, and thus protected activity under the FHA, as opposed to complaints of noise, fumes, etc. Additionally, they are too temporally remote from the July 2010 eviction to raise an inference of a causal connection. *See, e.g.*, *Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 499 (S.D.N.Y. 2004) ("Many of the incidents . . . occurred more than a year after [Plaintiff] filed his complaint and are therefore too remote to enable a jury to infer a causal relationship."). Further, Defendants continued to accommodate Plaintiff between 2008 and 2010, which they were unlikely to have done if they had an intent to retaliate for Plaintiff's earlier activity. Finally, if Plaintiff argued that her protected activity was a complaint in January 2010 to a HUD official who advised her to file a written complaint, (*see* Compl. at 3) – an argument Plaintiff has not made – this argument would also fail. There is no evidence that Defendants knew of Plaintiff's discussion with the HUD official, and the time lag between that discussion and the eviction is too long to support an inference of causation. *See, e.g.*, *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CV-4096, 2003 WL 22015434, at *9 (S.D.N.Y. Aug. 25, 2003) (six-month lag between protected activity and adverse action is "too temporally remote to support a retaliation claim").

Therefore, in order to ensure that their residents were eligible to be transferred into AWH when

it reopened in late 2010, Defendants changed their policy in early 2010 to no longer allow

deferred rent payment agreements.  (*Id.*)  Defendants have presented evidence showing that this

decision was an across-the-board policy change that applied to all of its residents and that did not

single out Plaintiff in any way.  (*See id.* ¶¶ 18-22, 26.)  Defendants have also presented evidence

that they in fact applied the policy similarly to all residents without regard to whether or not they

had engaged in protected activity, in that they refused to enter into deferred payment

arrangements with other tenants besides Plaintiff, none of whom had filed a formal complaint.

(*See id.* ¶ 33; Ds' 56.1 ¶ 8ee; Healy Aff. Exs. I, J.)  Again, Plaintiff neither addresses these facts

nor offers any evidence tending to create a genuine dispute of material fact regarding

Defendants' motives.  On this record, no rational finder of fact could conclude that Defendants'

asserted reasons are mere pretext.  Accordingly, Defendants are entitled to summary judgment.

Plaintiff argues that summary judgment is precluded by the existence of disputed facts as

to whether Defendants breached a contract with Plaintiff, whether Defendants breached their

fiduciary duties to Plaintiff, whether the Defendants are liable to Plaintiff for negligence, and

whether Defendants negligently exposed Plaintiff to harmful toxins.  (*See* P's Opp. 2-3.)  None

of these questions has anything to do with the sole claim Plaintiff asserts in the Complaint, which

alleges that Defendants initiated eviction proceedings against her in retaliation for filing the

HUD complaint.  "It is black letter law that a party may not raise new claims for the first time in

opposition to summary judgment." *Lovitch v. Cnty. of Orange*, No. 11-CV-2536, 2013 WL

3805142, at *4 (S.D.N.Y. July 19, 2013) (internal quotation marks omitted).  I therefore decline

to consider Plaintiff's allegations that Defendants are liable for breach of contract, breach of

fiduciary duty, or negligence.[12]

Plaintiff also suggests that the probable cause finding by WCHRC constitutes evidence of

retaliation that creates a genuine dispute of material fact as to Defendants' retaliatory motive.

(*See, e.g.*, P's 56.1 at 2-11 (including excerpts from Defendants' submissions to WCHRC and

WCHRC's investigative report).)  Given Plaintiff's *pro se* status, I will construe this as an

argument that collateral estoppel applies to WCHRC's preliminary finding of probable cause.

"Collateral estoppel, or issue preclusion, prevents parties . . . from relitigating in a subsequent

action an issue of fact or law that was fully and fairly litigated in a prior proceeding."  *Marvel*

*Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  Collateral estoppel applies when all

of the following four elements are satisfied:

> (1) the identical issue was raised in a previous proceeding; (2) the issue
> was actually litigated and decided in the previous proceeding; (3) the party
> had a full and fair opportunity to litigate the issue; and (4) the resolution of
> the issue was necessary to support a valid and final judgment on the
> merits.

*Id.* at 288-89 (internal quotation marks omitted).  A party is not barred from relitigating an issue

if the issue was not actually decided in the previous case.  *Proctor v. LeClaire*, 715 F.3d 402,

414 (2d Cir. 2013).  Here, Plaintiff misconstrues the finding by the WCHRC.  That agency's

Determination and Order merely found that probable cause existed to believe Defendants had

discriminated or retaliated against Plaintiff; it was not a finding that Defendants in fact had

violated the law.  The "preponderance of the evidence" standard of proof that governs the instant

civil case is entirely different from the "probable cause" standard that governed WCHRC's

initial investigation.  *See United States v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001)

---

[12] I also note that much of the evidence Plaintiff has submitted (newspaper articles, etc.) is inadmissible hearsay
which I cannot consider under Federal Rule of Civil Procedure 56.

("'[P]robable cause' is something less than a preponderance."); *United States v. $164,705 in U.S. Currency*, No. 04-CV-270, 2011 WL 4526784, at *7 (M.D. Tenn. Sept. 28, 2011) (probable cause standard "is hardly equivalent to the preponderance of the evidence standard here"), *report and recommendation adopted*, 2011 WL 5325784 (Nov. 3, 2011); *see generally Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (In the criminal procedure context, the "test for probable cause is not reducible to precise definition of quantification. Finely tuned standards such as . . . a preponderance of the evidence have no place in the probable cause decision. All [that is] required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act.") (internal quotation marks, citations and alterations omitted). WCHRC's finding of probable cause[13] does not have collateral estoppel effect or otherwise preclude Defendants from litigating whether Plaintiff can establish her case by a preponderance of the evidence.

### State Law Claims

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that the Complaint fails to state a federal law claim on which relief can be granted, I decline to exercise supplemental jurisdiction over any state law causes of action that may be raised in the Complaint. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

---

[13] I note that in finding probable cause, WCHRC may have been under the impression that Defendants received the HUD complaint shortly after the date it was signed by Plaintiff (February 8, 2010), (*see* P's 56.1 at 11; *but see* Compl. at 6 (noting filing date of July 12, 2010)), and that Defendants thereafter "began eviction proceedings," (P's 56.1 at 11). Because only excerpts of the agency's investigative report have been provided in connection with the instant Motion, I cannot assess the extent to which this impression influenced its conclusion. In any event, in this context the WCHRC's finding of probable cause carries no independent evidentiary weight in this Court; it is merely another entity's opinion or conclusion as to what the evidence (or lack thereof) does or does not show.

## IV.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED

as to the federal claim, and the state law claims are DISMISSED without prejudice.  The Clerk

of Court is respectfully directed to terminate the pending Motion, (Doc. 25), enter final judgment

in favor of Defendants, and close the case.

**SO ORDERED.**


Dated: July 9, 2014
       White Plains, New York


_____

CATHY SEIBEL, U.S.D.J.


16